# EXHIBIT A

**From:** JR Rimmelin
**Sent:** Thursday, July 17, 2014 3:12 PM
**To:** Tamara Knupp
**Cc:** Aframax Atlantic
**Subject:** FW: TALMAY - CLEAN RECAP C.P.17.07.14

Tamara,

Please file under

Recaps

Americas

Spot

Lightering

Talmay

Thank you.

JR Rimmelin // AET Inc Limited

Senior Executive, Chartering

M +1 (713) 376 9503

JRRimmelin@aet-tankers.com

**From:** jointtanker fzco [mailto:jointtankerfzco@googlemail.com]
**Sent:** Thursday, July 17, 2014 10:52 AM
**To:** JR Rimmelin
**Subject:** TALMAY - CLEAN RECAP C.P.17.07.14

TO : AET â€" ATTN : JR RIMMELIN

FROM : JT SHIPBROKERS

PLSD TO CONFIRM FIXTURE CONCLUDED AS PER CHARTERERS' AUTHORITY WITH ALL SUBJECTS LIFTED

C/P DATED : 17TH JULY 2014

CHARTERERS: MESSRS.  TALMAY TRADING INC.

AKARA BLDG., 24 DE CASTRO STREET

WICKHAMS CAY 1, ROAD TOWN TORTOLA, BRITISH VIRGIN ISLANDS

TANKER LIGHTERING VOYAGE CHARTER PARTY

PREAMBLE

PLACE Houston, TX

Date July 17th 2014

IT IS THIS DAY AGREED BETWEEN AET INC., LIMITED, CHARTERED OWNER (HEREINAFTER CALLED THE "OWNER") OF THE M/T AET TBN, OWNERS OPTION TO SUBSTITUTE SIMILAR VESSEL PROVIDED ALWAYS ACCEPTABLE TO CHARTERER (HEREINAFTER CALLED THE VESSEL")

AND  TALMAY TRADING INC   (HEREINAFTER CALLED THE "CHARTERER") THAT THE TRANSPORTATION HEREIN PROVIDED FOR WILL BE PERFORMED SUBJECT TO THE TERMS AND CONDITIONS OF THIS CHARTER PARTY, WHICH INCLUDES THIS PREAMBLE AND PART I AND PART II OF THE ASBATANKVOY FORM.  IN THE EVENT OF A CONFLICT, THE PROVISIONS OF PART I WILL PREVAIL OVER THOSE CONTAINED IN PART II.

**AA) SERVICE SHIP:**   M/T AET TBN as nominated and described in the nomination telex(s) provided  5  days prior to commencement of lightering.  Owners option to substitute suitable similar vessel.

M/T  AET TBN_____        Deadweight_____,    Draft_____   flag____

Year Built_____   Class_____

LOA_____   Beam_____   BCM_____   KTM_____

**BB) LAYDAYS:**  1st Vessel laycan 29/30 July 2014 - 2nd Vessel Laycan 30/31 July 2014

9t•   Charterer to narrow to 1 day load window 5 days prior to commencement of laycan

**CC) LOADING:**   One Lightering Position

| X | Galveston N28-35 W94-15

NUMBER OF FULL SERVICE LIGHTERINGS: 2 (Two)

Off the Ship-To-Be-Lightered â€œUNITED KALAVRYTAâ€   (Hereinafter called the "STBL").

**DD) DISCHARGING:**   One Safe Port Houston Texas

**EE) CARGO:**   One/Two Grades No Heat Crude WVNS

QUANTITY: Approx. 500,000 Bbls  X (I) .

**FF) FREIGHT:**

|[X| a I) LUMPSUM USD 400,000  per lift X  (I) basis Galveston Lightering Area plus overtime, if incurred, at the rate of USD 80,000 PDPR in excess of a minimum period of 3 cumulative Service Ship's days.  Time to count as per AET Charter Duration/Delay clause, from NOR through dropping last outbound Pilot. If discharge Texas City minus 10,000.
   If discharge Mississippi River south of but including New Orleans then plus USD 50,000 for the first berth. If discharge Mississippi River north of New Orleans then plus USD 60,000 for the first berth. If discharge Baton Rouge then plus USD 90,000 for the first berth. If discharge Sabine River port then plus USD 15,000.  Notwithstanding any other clauses pertaining to the use of â€˜tugsâ€™, if extra tug used for Freeport discharge then cost to be for Charterer's account as per tug invoice.  If discharge Corpus Christi public docks, then extra costs endemic to these docks to be for Chartererâ€™s account.  If extra tugs used for Convent, La. discharge then costs to be for Chartererâ€™s account.  If discharge Mobile, Ala. or Pascagoula, MS then plus USD 35,000 to apply.

All extra port / berth costs, expenses, steaming time, and time used in connection with service ship calling at a second and subsequent port(s)/berth(s) shall be for chartererâ€™s account.

~~Freight and Overtime to be paid in full together upon completion of  lightering operation / upon receipt of invoice for freight and overtime accumulated.~~

**Freight BBB** â€" Owners require funds before vessel discharges into installation

b) In addition to the use of the Owners Service Ship(s), freight shall include a Transfer Fee for Owner supplied equipment, consisting of but not limited to, Fendering Equipment, Cargo Hoses, and a qualified Mooring Master.

c) Freight additionally shall include port charges incurred by the Service Ship(s) normally for the account of Owners per *ASBATANKVOY PART II CLAUSE 12* for a Single berth, single port discharge at Charterers/Consignees facilities.  Any additional Expenses incurred for the use of more than one berth/port, including time and port/shifting charges shall be borne by Charterer.

d) Charterer has the option to cancel this lightering 5 days prior to the arrival of the STBL without any penalty.   If canceling within the 5 day period, Charterer to pay USD 80,000 for each day within the 5 day period of the STBLâ€™S arrival, max penalty never to exceed base freight USD 400,000 for this lightering contract.  If the Service Ship has tendered a valid NOR within the agreed laycan, the LUMPSUM portion of freight is due to Ownerâ€™s regardless of any actions taken by the Owner to mitigate their damages caused by the cancellation directly or indirectly.


**GG) FREIGHT PAYABLE TO:**

      Citibank N.A.

      111 Wall Street, New York, NY 10043

      ABA No. 021000089, SWIFT CITIUS33

      For credit to AET Inc Limited

      Account No. 30776272




**HH) TOTAL LAYTIME:**   Not Applicable




**II) DEMURRAGE:**   Not Applicable




**JJ) COMMISSION:**   1.25% Address Commission to TALMAY TRADING INC  and 1.25% brokerage commission to JT Shipbrokers (Canada) on Lumpsum Freight and Overtime
   .




**KK)** The place of General Average and Arbitration proceedings to be New York, U.S. Law to apply.




**LL) SPECIAL PROVISIONS:** The following AET SPOT LIGHTERING TERMS 1- 33 as attached are deemed a part of this Charter Party

WITNESS THE SIGNATURE OF:                          AET INC., LIMITED


BY:_____


WITNESS THE SIGNATURE OF:                          TALMAY TRADING INC


BY:_____


*****************************END RECAP****************************


MANY THANKS FOR FIXTURE AND BEST REGARDS


--

Les Warr
JT Shipbrokers Ltd (Canada)

Phone: 44 (0) 1733 254123

Mobile: 44 (0)7778 556003
Email : office@joinm.net

**PLEASE ALWAYS REPLY TO JT SHIPBROKERS LTD GENERAL EMAIL ADDRESS office@joinm.net**

Yahoo les_warr

# AET LIGHTERING SPECIAL PROVISIONS

C/P FORM: ASBATANKVOY

The following special clauses 1- 33 are deemed a part of this Charter Party.
June 2011

1. Y/A 1974 as amended 1994
2. ITOPF
3. AET NOR
4. AET DURATION DELAY
5. AET PROCEDURES
6. AET LIABILITY
7. AET NOMINATION/NOTICES
8. AET INSURANCE, ELIGIBILITY AND COMPLIANCE
9. INERT GAS SYSTEM
10. CRUDE OIL WASHING
11. AET PUMPING
12. AET CARGO RETENTION
13. AET U.S. CUSTOMS REGULATIONS (SCAC)
14. AET BILL OF LADING PROCEDURES/INDEMNIY
15. TEXACO OIL POLLUTION CLAUSE
16. EXXON DRUG AND ALCOHOL POLICY CLAUSE
17. ASSIGMENT CLAUSE
18. CHARTER PARTY ADMINISTRATION CLAUSE
19. AET EXTRAORDINARY TUG USAGE CLAUSE
20. CANCELLATION CLAUSE
21. ISPS CLAUSE
22. U.S. BUREAU OF CUSTOMS AND BORDER PROTECTION CLAUSE
23. VETTING APPROVAL
24. CARGO BLENDING CLAUSE
25. HEATED CARGO, HEATING, AND HEAT-UP CLAUSE
26. ASSIST TUGS
27. FUEL OIL CARGO CLAUSE
28. PERSONNEL TRANSFER
29. VAPOR BALANCING
30. MARINE CONTAINMENT VESSEL (MCV) CLAUSE
31. ADDITIONAL PILOT CLAUSE
32. HULL CLEANING CLAUSE
33. Houston Pilot Clause

**IN WITNESS WHEREOF,** The parties have caused this Charter, consisting of a Preamble, Part I above and Part II Of the attached ASBATANKVOY, to be executed in duplicate as of the day and year first above written.

WITNESS THE SIGNATURE OF:                    **AET Inc Limited**

                                             BY:

WITNESS THE SIGNATURE OF:

                                             BY:

**AET INC LIMITED**

**LIGHTERING VOYAGE CLAUSES**

**1.  Y/A 1994**

**2.  ITOPF - OWNERS WARRANT VESSEL IS A MEMBER OF ITOPF AND WILL REMAIN SO FOR THE DURATION OF THIS CHARTER PARTY.**

**3.  AET NOTICE OF READINESS - 7/89**

Delete Notice of Readiness Clause 6, Part II - insert under Clause M, Part I

Upon the Service Ship's arrival at the designated lightering location (Clause C, Part I) the Master or his agent shall give the Charterer or his agent notice by telex, wireless or telephone that the Service Ship is ready to commence the lightering operation and time as herein provided shall commence upon the tendering of such NOR whether or not STBL is in position and/or ready in all respects to commence the operation.  Time shall not count if the Mooring Master as well as Owner furnished lightering equipment have not arrived at the lightering position prior to or in conjunction with the arrival of the STBL.

**4.  AET CHARTER DURATION/DELAY - 1/90**

Delete Hours for loading and discharging - Clause 7, Part II - insert under Clause M, Part I

Charterer shall be allowed the number of days at rates specified in Clause F, Part I for the entire operation commencing with tendering by Service Ship(s) of NOR at lightering area and continuing through dropping last outbound sea pilot from final discharge berth.

When more than one lightering is performed by the same Service Ship(s) on consecutive voyages the time shall run continuously from the initial tendering of NOR by the Service Ship(s) until dropping last outbound sea pilot on the final voyage, including harbor steaming and returning ballast voyages to/from the same STBL.  When more than one Service Ship(s) is used in the operation the total time applicable for final freight determination per Freight Clause shall be the sum of all time used by all Service Ship(s) as herein outlined.

If after tendering of NOR by the Service Ship(s) darkness, weather, including but not limited to lightening, storm, wind, waves or swells or for any reason beyond Owners control prevents or delays the Service Ship(s) from carrying out the operation, time so lost shall count as time used for freight purposes.

## 5. AET PROCEDURES - 1/90

Owner and Charterer warrant that the lightering operation shall be carried out in accordance with the procedures set out in the latest revised edition of the *International Chamber of Shipping Oil Companies International Marine Forum, Ship to Ship Transfer Guide for Petroleum.*

It is understood and agreed that the crew of the STBL will be required to assist in handling fenders and cargo hoses as well as mooring and unmooring as designated by the Mooring Master at the transfer site at no cost to AET.

Owner is to exercise due diligence in the supplying of all equipment, including but not limited to, sufficient Yokahama type fenders, wires and cargo hoses.

## 6. AET LIABILITY - 7/89

The Master of each vessel shall be responsible for the safe operation of his vessel throughout the transfer operation.

The Mooring Master provided by AET shall coordinate the transfer operation, serving as advisor only and assisting the Master in assuring that the requirements of all AET and U.S. Coast Guard regulations are met, and shall at no time be responsible for any damages, losses, expenses and costs of any nature whatsoever, including, without limitation, any loss of time and/or delays that may be incurred of sustained by either party of third party arising out of, or in any matter related to the lightering of vessels, even if said claims and/or damages, losses, delays, expenses or costs arise out of the negligence of the Mooring Master.

The Charterer shall be liable for and shall bear the risk of A) any damage, loss or liability on account of the injury or death of Charterer's personnel or damage or destruction of Charterer's property, howsoever or by whomsoever caused and B) any damage to or loss of property belonging to a third party, arising from or out of incorrect or inadequate information furnished by the Charterer, including its agents, employees, master and crew members of its vessel, or by any negligent act or omission by its vessel while using Owner's facilities or passing to or from same, and shall hold harmless, indemnify and defend Owner from and against all claims, suits, liabilities and expenses on account of injury to or death of Charterer's personnel as aforesaid or damage to or destruction of property owned by third parties as aforesaid.

The Owner shall be liable for and shall bear the risk of A) any damage, loss or liability on account of the injury or death of Owner's personnel or damage or destruction of Owner's property, howsoever or by whomsoever caused and B) any damage to or loss of property belonging to a third party, arising from or out of incorrect or inadequate information furnished by the Owner, including its agents, employees, master and crew members of its vessel, or by any negligent act or omission by its vessel while using Charterer's facilities or passing to or from same, and shall hold harmless, indemnify and defend Charterer from and against all claims, suits, liabilities and expenses on account of injury to or death of Owner's personnel as aforesaid or damage to or destruction of property owned by third parties as aforesaid.

Nothing herein shall be construed as a waiver or Owner's/or Charterer's right to limit his liability in accordance with applicable international convention and/or national legislation.

## 7. AET NOMINATION AND NOTICES - 1/90

Unless otherwise agreed Charterer shall nominate discharge port(s) and berth(s) at least 96 hours prior to the ETA of the STBL at the designated lightering area.  Such nominated port(s)/berth(s) shall be in accordance with range or port(s) designated in Clause D, Part I.  Charterer has the option to change the discharge port within the ranges described, provided this does not affect the suitability of the nominated Service Ship to call at that port.  Charterers to be responsible for all additional cost.

Upon sailing loadport, and every two days thereafter until 96 hours prior to STBL ETA, Master shall advise AET of vessel's ETA to Charterer's intended loadport.  The Master of the STBL must supply ETA information 96, 72, 48, and 24 hours prior to arrival at the lightering station. ETA messages are to be sent to AET Inc. Limited, by Email (aet-ops@aet-tankers.com). After the 48 hours ETA notice is given, Master is to update immediately if ETA changes by more than six (6) hours.

AET will provide pre-arrival information and an ITOL lightering questionnaire for the STBL to charterers. Charterer's should deliver the pre-arrival information and the ITOL lightering questionnaire to the vessel owners/operator/Master. The ITOL questionnaire with the requested information and a mooring diagram for the vessel should be returned to AET no later than (*96 hours*) prior to the lightering operation.

## 8. AET INSURANCE, ELIGIBILITY AND COMPLIANCE (12/89)

Owner/Charterer warrant that their respective vessels have Hull and Machinery insurance, plus full P & I, including full crew liabilities and such policies/insurance shall be in full force for the duration of the Charter.

Owner/Charterer warrant that their respective vessels are in all respects eligible under applicable conventions, law and regulations for trading to the ports and places specified in part I(C) and (D) and that she shall have on board for inspection by the appropriate authorities all certificates, records, compliance letters and other documents required for such service, including, but not limited to, a *U.S. Coast Guard Certificate of Financial Responsibility (Oil Pollution)* and the certificate required by *Article VII of International Convention on Civil Liability for Oil Pollution damage,* as amended.

Owner/Charterer further warrant that their vessel does, and will, fully comply with all applicable conventions, laws, regulations and ordinances of any international, national, state or local governmental entity having jurisdiction, including, but not limited to, the *U.S. Port and Tanker Safety Act,* as amended, the *U.S. Federal Water Pollution Control Act,* as amended, *MARPOL 1973/1978* and *SOLAS 1974/1978/1983.*

Any delays, losses, expenses or damages arising as a result of the Service Ship(s) failure to comply with this clause shall be for Owner's account as it pertains to the Service Ship(s) and time shall not count for Charterer for delay caused by Service Ship(s) failure to comply with the foregoing warranties.

Any delays, losses, expenses or damages arising as a result of the STBL's failure to comply with this clause shall be for Charterer's account and time shall count for Charterer for delay caused by the STBL's failure to comply with the foregoing warranties.

In the case of reverse lightering paragraph 4 and 5 to be substituted as follows:

Any delays, losses, expenses or damages arising as a result of the STBL's failure to comply with this clause shall be for Owner's account as it pertains to the STBL's and time shall not count for Charterer for delay caused by STBL's failure to comply with the foregoing warranties.

Any delays, losses, expenses or damages arising as a result of the Service Vessel(s) failure to comply with this clause shall be for Charterer's account and time shall count for Charterer for delay caused by the Service Vessels(s) failure to comply with the foregoing warranties.

In the interest of safety, Owners will recommend that the Master observe the recommendations as to traffic separation and routing which are issued from time to time by the International Maritime Organization (IMO) or as promulgated by the State of the flag of the vessel or the State in which the effective management of the vessel is exercised.

## 9. INERT GAS SYSTEM   CHEVRON (5/1/87)

Owner warrants that the vessel has a working Inert Gas System (IGS) and officers and crew are experienced in the operation of the system.  Owner further warrants that the vessel will arrive at load port alongside STBL with cargo tanks inerted and that tanks will remain inerted throughout the voyage and during discharge.

Master may be requested by terminal personnel or independent inspectors to breach the IGS for purposes of gauging, sampling, temperature determination and/or determining the quantity of cargo remaining on board after discharge.  Master shall comply with these requests consistent with the safe operation of the vessel.

Any delays resulting from non-compliance with this clause shall not count as used laytime nor be compensated for at the overtime rate if allowed laytime has expired.

## 10. CRUDE OIL WASHING  CHEVRON (5/1/87)

Owner warrants that the vessel is equipped for and is otherwise capable of Crude Oil Washing (C.O.W.) all cargo tanks. Owner further warrants that the vessel complies with all international, national, and local requirements applicable to C.O.W.  If requested by Charterer, vessel will conduct full C.O.W. of all tanks containing cargo concurrent with discharge of cargo.  In the event of C.O.W. the warranted maximum discharge time shall be increased by ten (10) hours if all cargo tanks are crude oil washed, or pro rata thereof if fewer than all cargo tanks are crude oil washed.

## 11. AET PUMPING (10/1/89)

Owner warrants vessel is capable of discharging her entire cargo within 24 hours or maintaining 100 PSI at ship's rail provided shore facilities are capable of receiving same.  Owner is to instruct Master to clarify by protest letter or written remarks in time sheets, countersigned by receivers, whenever pumping time exceeds warranted period.  Failing above Charterer will deduct excessive pumping time over and above warranted limit.

## 12. AET CARGO RETENTION (10/1/89)

In the event that any cargo remains on board upon completion of discharge, Charterer shall have the right to claim an amount equal to the FOB port loading value of such cargo, plus freight and insurance due with respect thereto, provided that the volume of cargo remaining on board determined pumpable liquid by an independent surveyor.  Surveyor to be mutually agreed and paid for 50/50 by both parties.  Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

## 13. AET U. S. CUSTOMS REGULATIONS (SCAC CODE) (10/1/89)

AET Inc Limited will provide the Standard Carrier Alpha Code (SCAC) of "AETK" which will prefix a Bill of Lading serial number provided by the Owner to form a "unique identifier" in accordance with U.S. Customs regulations, which will be entered on each Bill of Lading, cargo manifest, cargo declarations and other cargo documents relating to any voyage/lightering performed under this charter.  Should this code be changed by the Charterer, such change must be done in a timely manner well prior to the commencement of loading. Any delays, fines or expenses resulting directly or indirectly from such changes are to be for Charterers account.

**14. AET BILL OF LADING PROCEDURES / INDEMNITY (10/1/89)**

In the event of non presentation of the Original B/Lading to the Master of the Ship-to-Be-Lightered, no negotiable B/Lading should be issued for the lightered parcel on board the Service Ship. In lieu of a negotiable B/Lading the Master of the Service Ship will issue a cargo manifest. Nevertheless, Charterer reserves the right to require the master of the Service Ship to sign B/Lading(s) as issued by vessels agents or cargo inspectors.

In the event that an Original Bill of Lading is not available at the ultimate discharge port on vessel's arrival, Owner agrees to discharge cargo at a facility of facilities designated by Charterer against a telex invoking the following Letter of Indemnity wording.

*In consideration of the owner delivering the cargo in accordance with this Charter Party and complying with our above request Charterer hereby agrees as follows:*

*1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability loss or damage of whatsoever nature which you may sustain by reason of delivering the goods to our order in accordance with our request.*

*2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the goods as aforesaid to provide you or them from time to time with sufficient funds to defend the same.*

*3. If the vessel or any other vessel or property belonging to you should be arrested or detained or if the arrest or detention thereof should be threatened, to provide such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and to indemnify you in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.*

*4. As soon as one original bill of lading for the above goods shall have arrived and/or come into our possession, to produce and deliver the same, duly endorsed, to you whereupon our liability hereunder shall cease. Should no bill of lading be issued we will produce a letter duly endorsed by the cargo owner stating that the cargo was received in good order and that no bills of lading were issued, likewise whereupon our liability will cease.*

*5. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.*

*6. This indemnity shall be construed in accordance with the laws of the United States of America and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the high court of justice of the United States of America.*

## 15. TEXACO OIL POLLUTION INSURANCE CLAUSE

Owner warrants that they have in place with their P&I Club the Standard Oil Pollution Cover of 1 billion U.S Dollars Oil Pollution Insurance Cover available through their P&I Club or through underwriters providing first class security, and Owner's further warrant that such cover will remain in effect for the duration of this Charter.

## 16. EXXON DRUG AND ALCOHOL POLICY CLAUSE

Owner warrants that it has a policy on drug and alcohol abuse (policy) applicable to the vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the control of drugs and alcohol on board ship.

Under the policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/ alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the policy should be that the frequency of the unannounced testing to be adequate to act as an effective abuse deterrent and that all the Officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations.

Owners further warrant that the policy will remain in effect during the term of this charter and that owner shall exercise due diligence to ensure that the policy is complied with. It is understood that an actual impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

Owners further warrant that a blanket declaration confirming above has been submitted to Charterer.

## 17. ASSIGNMENT CLAUSE

In the event it is necessary, Owner has the right to assign this contract to Owners affiliate or subsidiary with Charterer's approval, which is not to be unreasonably withheld.

## 18. CP ADMINISTRATION CLAUSE

No formal written and signed Charter Party will be prepared unless specifically requested by either party.  Charter party terms and conditions are evidenced by the fixture confirmation telex/fax in conjunction with written approval to the telex/fax by both Charterers and Owners; each party confirming agreement by their authorized representative within two (2) working days by telex/fax to the other party.

## 19. AET EXTRAORDINARY TUG USAGE CLAUSE

When for the purpose of vessel safety, tugs are required to assist in transit to/form a port including the necessity of holding tugs; due to abnormal seasonal conditions, terminal requirements,

navigational abnormalities or any such circumstances not incurred under normal transits to/from port and/or berth, all such expenses for Charterer's account

## 20. CANCELLATION CLAUSE

As per main terms

## 21. ISPS CLAUSE

(A)  (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code

including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 22. U.S. BUREAU OF CUSTOMS AND BORDER PROTECTION CLAUSE

Owners warrant that they are aware of the requirements of the US Bureau of Customs and Border Protection (CBP) issued on December 5th 2003 under Federal Register Part II Department of Homeland Security 19 CFR Parts 4, 103, et al and will comply fully with these requirements for entering US ports.

In the event of any action being taken against the Vessel in respect of Owners failure to comply with the above warranty insofar as such failure is due to the act, error or omission, negligent or otherwise of Owners, their servants, agents or contractors and not the act, error or omission, negligent or otherwise of Charterers:
(1) Owners shall be liable for any loss, damage, delay, costs or expenses incurred thereby; and
(2) any time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage

In the event of any action being taken against the Vessel due to the act, error or omission, negligent or otherwise of Charterers , their servants, agents or contractors and not the act, error or omission, negligent or otherwise of Owners:
(1) Charterers shall be liable for any loss, damage, delay, costs or expenses incurred thereby; and
(2) any time lost thereby shall count as laytime or, if the Vessel is on demurrage, as demurrage

## 23. VETTING APPROVAL

Any vessel nominated for lightering should have current Oil Major vetting (or suitable alternative Sire report). All nominated vessels must be cleared by AET Inc Ltd prior to acceptance. Notice of clearance to be given no more than 24 hours after initial nomination of vessel.

## 24. CARGO BLENDING CLAUSE

Provided safe in the opinion of the Master and always provided within the technical capabilities of the vessel, Charterer's to have the option to blend and/or circulate cargo on board. Delay to the vessel at the load or discharge ports caused by blending and/ or circulating shall count towards allowed time or, if allowed time has expired, as time on overtime. Additional cost incurred due to such blending/ recirculation operations shall be for Charterer's account. Such operation shall be carried out entirely at Charterer's risk and in no event shall Owner be responsible for the quality of cargo resulting from such admixture.

## 25.  HEATED CARGO, HEATING, AND HEAT-UP CLAUSE

In the event Charterer's request heated cargo to be loaded, Owners warrant cargo up to 160 degrees Fahrenheit can be loaded and up to 135 degrees Fahrenheit can be maintained.

Where Owner is requested to "heat up" cargo above 135 degrees Fahrenheit and maintain such elevated temperature, Owner is only obligated to maintain the base temperature of 135 degrees Fahrenheit and Charterer shall be responsible for the cost.

Charterer shall reimburse Owners for bunkers consumed for maintaining loaded temperature or cargo heating purposes against Owners invoice, which shall be duly supported by Master's statement of consumption and copy of bunkers  supplier's invoice for bunkers price actually paid during last bunkering operation.

## 26.  ASSIST TUGS

The cost for up to 4 tugs used per ship-to-ship transfer operation to assist the service-ship for navigation, berthing, anchoring, unberthing or heaving anchor shall be for AET's account.  If anchoring and heaving anchor is by Charterer's request to facilitate the Charterer's or Terminal, the cost of tugs, if used, shall be for the Charterer's account.  If required by the Master, Terminal or Port Officials, additional tugs, including tugs required for standby or holding at a berth, anchorage or mooring effecting safe berthing due to river conditions or weather shall be dispatched.  All cost for additional tugs shall be for Charterer's account.

## 27.  FUEL OIL CARGO CLAUSE

No tank cleaning whatsoever is required. Owner, Vessel, Master and Crew, shall not be responsible for any contamination to the specification of the Fuel Oil as a result of loading the cargo without prior tank cleaning. Charterer hereby indemnifies Owner, Vessel, Master and Crew against any and all cargo contamination claim that may arise from loading this cargo without prior tank cleaning.

If instructed, Vessel shall carry out cargo tank purging prior to loading the cargo. Vessel shall be allowed to tender notice of readiness on arrival load port, irrespective of her tank purging status

and condition on arrival. All time used for purging cargo tanks, after the arrival of the Vessel at load port(or all time in access of normal steaming time from last discharge port, if vessel is not allowed to carry out tank purging at customary anchorage) , shall count as allowed time and/or overtime if Vessel is on overtime. Vessel shall exercise due diligent to carry out cargo tank purging while in route to load port if instructed by Charterer.

## 28. PERSONNEL TRANSFER

It is understood that in the event the STBL or SS  does not permit the use of available personnel transfer basket for safe boarding of personnel onboard, AET shall be at liberty to use any other safe means (including the use of helicopter if available) to replace their mooring master and/ or assistance mooring master onboard. Charterers shall be responsible for all additional cost.

## 29.  VAPOR BALANCING

~~In the event Charterer's request "Vapor Balancing" to be conducted as part of an STS operation. Owners will provide the required equipment and technical experience to advise the crews of both vessels in safe operations of this procedure.~~

~~An additional cost of $10,000 per STS operation to apply~~

~~Charterer's to indemnify Owners of the following:~~

~~Of any liability, loss, damage or expenses of whatsoever nature which may be sustained by reason of delivering the cargo in accordance with Charterer's request.~~

~~Of any liability, loss, damage or expenses of whatsoever nature which may be sustained by reason of delivering the vapors in accordance with Charterer's request.~~ N/A

## 30. MARINE CONTAINMENT VESSEL (MCV) CLAUSE

~~Owners own and operate two (2) Aframax vessels within their US Gulf lightering program: EAGLE LOUISIANA and EAGLE TEXAS, which are on standby to the MWCC (Marine Well Containment Company).  Charterer's agree to accept these vessels for lightering nominations provided the vessels are found acceptable in accordance with Charterer's vetting and screening procedures. Charterer's agree that in an event MWCC calls to activate one or both vessels while nominated or ballasting to a load port; Owners shall reserve the right to withdraw the MCV vessel and provide a suitable replacement vessel.   Additionally, Charterer's agree that in an event MWCC calls to activate one or both vessels and the vessel is laden with Charterer's cargo; Owners reserve the right to provide suitable replacement vessel to lighter the MCV vessel free of cargo to Charterer at no additional cost.~~ N/A

## 31. ADDITIONAL PILOT CLAUSE

Customary pilot cost for inbound and outbound transit, One (1) Port/ One (1) berth are for Owners account, covered within the lightering lumpsum. Any additional pilot cost including but not limited to the below will be for Charterer's account.

Additional pilot service for shifting to berth after anchored at the terminals customary anchorage inside pilotage waters.

Additional pilot for shifting to anchorage after discharge, if required by the port authorities to await outbound transit. This should include but not limited to awaiting daylight, weather and traffic and any abnormal port event.

Additional pilots service required due to extended length of transit time. This should include but not limited to fog delays, weather delays and exceptionally strong river current.

## 32. HULL CLEANING CLAUSE

Should the lighter vessel be detained in excess of twenty-one (21) days total operation time, hull cleaning shall be performed with time so spent cleaning payable at the overtime or escalation rate as applicable. Hull cleaning costs shall be re-billed to Charterer's with supporting documentation, but maximum twenty-five thousand dollars ($30,000.00) cost of hull cleaning for Charterer's account.

## 33. HOUSTON PILOTS CLAUSE

During this contract, if Charterers instruct any nominated vessel to exceed 40ft draft while scheduled to discharge at Houston / Baytown terminals, Charterers are to pay for any additional pilot fees associated with entering Houston Ship Channel with a draft exceeding 40ft.

## END

Clarkson
Shipping Services USA, Inc.
1333 West Loop South, Suite 1525
Houston, TX  77027
Phone:  713-235-7400
Fax:   713-235-7449

| | |
|---|---|
| Association of Ship Brokers<br>& Agents (U.S.A.), Inc.<br>October 1977 | CODE WORD FOR THIS<br>CHARTER PARTY:<br>ASBATANKVOY |

## TANKER VOYAGE CHARTER PARTY

### PREAMBLE

Place          Date

IT IS THIS DAY AGREED between _____
Chartered owner/owner (hereinafter called the "Owner") of _____
SS/MS _____ (hereinafter called the "Vessel")
and _____ (hereinafter called the "Charterer")
That the transportation herein provided for will be performed subject to the terms and conditions of this charter party, which includes the Preamble and Part I and Part II.  In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.      Description and Position of Vessel:

Net Registered Tonnage:

Deadweight:                    tons (2240 lbs.)          Classed:

Loaded draft of Vessel on assigned summer freeboard          in. in salt water.

Capacity for cargo:          tons (of 2240 lbs. Each)          % more or less, Vessel's option

Coated:          ____ Yes ____ No
Coiled:          ____ Yes ____ No          Last two cargoes:

Now:                    Expected Ready:

B.      Laydays:
                Commencing:                    Cancelling:

C.      Loading Port(s):

                                                    Charterer's option:

D.      Discharging Port:

Charterer's option

E.      Cargo:

F.      Freight Rate:                                             per ton (of 2240 lbs. Each).

G.      Freight Payable to:

H.      Total Laytime in Running Hours:

I.      Demurrage per day:

J.      Commission of            is payable by Owner

        on the actual amount freight, when and as freight is paid.

K.      The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.      Tovalop:  Owner warrants vessel to be member of TOVALOP scheme and will be so maintained throughout duration of this charter.

M.      Special Provisions.

        IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.

Witness to signature of:                    _____

                                            By: _____

Witness to signature of:                    _____

                                            By: _____

PART II

1. WARRANTY-VOYAGE-CARGO.  The vessel, classed as specified in Part I hereof, and to be maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer's full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo.  If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence maintain the temperatures requested.

2. FREIGHT.  Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection.  Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon.  No deduction of freight shall be made for water and/or sediment contained in the cargo.  The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. DEADFREIGHT.  Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition.  In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. NAMING LOADING AND DISCHARGE PORTS.
(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed.  However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | On a voyage to a port or ports in: |
| --- | --- |
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
|  | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
| --- | --- |
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
|  | Or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTER | Mediterranean (from Western Hemisphere). |

© Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5. LAYDAYS.  Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction.  Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the canceling date stipulated in Part I, the Charterer shall have the option of canceling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. NOTICE OF READINESS.  Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e. finished mooring when at a seafooading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs.; However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has not control, such delay shall no count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING.  The number of running hours specified as Laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime.  If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime.  Time consumed by the vessel is moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE. (a) Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate stipulated in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified.  If, however, demurrage shall be incurred at ports of loading and/or discharge because by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced to one-half the amount stated in Part I per running hour or pro rata for part of an hour for demurrage incurred.  The Charterer shall not be liable for any demurrage for delay caused by strike, lockout stoppage or restraint of labor for Master, officers and crew of the vessel or tugboat or pilots.

9. SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart there from always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.      PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging I all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the charter, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. DUES-TAXES-WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the Basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a). CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 degrees F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 degrees F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a). ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

© Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. QUARANTINE. (a) Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not to be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at a wharf which is not rat-free or stegomyia-free, she shall before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.  CLEANING.  The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector.  The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.        GENERAL EXCEPTIONS CLAUSE.  The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:-any act, neglect, default or barratry of the Master, pilots, mariners or their servants of the Owner in the navigation or management of the Vessel; fire, unless caused by personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner.  And neither the vessel nor Master or Owner, nor the Charterer, shall, unless so otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from;-Act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest of restraint of princes, rulers or people; or seizure under legal process provided bond is  promptly furnished to release the vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.  ISSUANCE AND TERMS OF BILLS OF LADING
(a) The master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter.  The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading.  In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT.  This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation.  The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act.  If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE.  In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo shippers, consignees, or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.  If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.  Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, by made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE.  General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, and as to matters not provided for by these Rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter.  If a General Average statement is required, it shall be prepared at  such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer.  Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges.  General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested.  Ay cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized an licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME COLLISION CLAUSE.  If the Vessel comes into collision with another ship as a result of negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.  The foregoing provisions shall also apply where the owners operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

(v) LIMITATION OF LIABILITY.  Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of the international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge-the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo threat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port the Owner shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo threat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

© The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, water, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or incompliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or incompliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owner shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel or stores at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, dead freight, demurrage and costs, including attorney's fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any bills of lading covering the same, or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the city of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court maritime jurisdiction in the city above mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precise the same force and effect as if such arbitrator had been appointed by the tow arbitrators. Until each time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE.  Owner agrees to participate in Charterer's program covering oil pollution avoidance.  Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place.  All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange.  If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc. retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage.  Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

BILL OF LADING

Shipped in apparent good order and condition by _____
On board the _____ Motorship/Steamship _____
whereof _____ is Master, at the port of_____
_____
_____
_____
_____
to be delivered at the port of _____
or  so near thereto as the Vessel can safely get, always afloat, unto _____
_____
or order on payment of freight at the rate of_____
_____
This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London _____
Between _____ and _____, as Charterer, and all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____day of

Master